UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RASHID ASH-SHEIKH JUNAID,      )
                               )
        Plaintiff,             )
                               )
    vs.                        )          Case No. 4:04CV57 CDP
                               )
GARY KEMPKER, et al.,          )
                               )
        Defendants.            )

## MEMORANDUM AND ORDER

Plaintiff Rashid Ash-Sheikh Junaid filed this suit while he was incarcerated

at the Potosi Correctional Center (PCC) in Missouri.[1]   In his complaint, Junaid

alleges that defendants (all current or former employees of the Missouri

Department of Corrections) violated his rights under the First, Eighth, and

Fourteenth Amendments, the Missouri Bill of Rights, and the Religious Land Use

and Institutionalized Persons Act (RLUIPA) by discriminating against him based

on his religion and retaliating against him for filing a lawsuit.  Defendants seek

summary judgment, asserting that the policies at Potosi comply with the

Constitution and RLUIPA.  There are no genuine disputes of material fact, and

defendants are entitled to summary judgment.

_____

[1]Junaid was released from the custody of the Missouri Department of Corrections
(MDOC) in March of last year.

## Legal Standards Governing Summary Judgment

In considering a motion for summary judgment, the court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). As the moving party, defendants must establish that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. Under these standards I review the facts in this case.

## Factual Background[2]

Junaid, previously known as Michael Cleaver, was an inmate at PCC until he was released from custody on March 18, 2008. Defendants Winfrey Dickerson, Charles Dwyer, Gary Kempker, Thomas King, George Lombardi, Steve Long,

_____

[2]Unless noted otherwise, the facts listed here are undisputed.

Alan Luebbers, Don Roper, Dora Schriro, and Pat Smith are all current or former employees of MDOC who worked at PCC during the relevant time period.

Junaid claims that defendants: (1) denied his request for Halal food and failed to properly screen food for pork and pork byproducts; (2) prevented members of other religious groups from attending Muslim services; (3) prevented him from wearing his religious headgear at times other than during religious services; (4) refused to allow the Muslim group to conduct fundraisers; (5) discriminated in the hiring of prison chaplains and Volunteers in Corrections; (6) refused to accept money mailed to him because it only contained his legally-changed name, and not his incarceration name; (7) refused to allow the Muslim group to hold religious classes; and (8) retaliated against him for filing litigation.

1.  Denial of Islamic Food

To accommodate various prisoners' dietary restrictions, including religious diets, it is MDOC policy to offer meat-free and pork-free meal options.  For example, when the main entree is a pork item, one of three non-pork items is offered as a substitute:  the meat alternative is either cooked dried beans, cheese, or peanut butter.  MDOC's Menu Planning policy also requires that all foods containing pork be identified as such on the menu.  PCC uses a buyer from MDOC to buy food that has never had any contact with pork, and who looks at the label to

make sure that the food has no pork or pork byproducts in it. There is no policy at PCC addressing the way animals are slaughtered.

Junaid testified that many of the items served in the kitchen contain pork byproducts or pork derivatives. In his original Informal Resolution Request (IRR), Junaid provided a list of examples of these unacceptable ingredients, and suggested that some of the listed ingredients would be acceptable if certified Kosher, Pareve, or Halal by either a Jewish or Islamic organization. Junaid requests that all food be properly screened for pork and pork byproducts; that all food served be certified Kosher, Pareve, or Halal; and that any meat served come from an animal slaughtered in conformity with Islamic law.[3] PCC denied Junaid's requests, claiming that the non-pork options offered were sufficient to meet Junaid's religious needs. In instances where Junaid thought that the pork-alternative offered had pork in it, he would eat "everything else" but claims that often he was forced to either eat the pork or be hungry. Junaid was permitted to buy food from the canteen, but claims that a lot of the food offered at the canteen also contains pork.

2. Restricted Attendance of Muslim Group Worship

---

[3]According to Junaid's testimony, this means that "they are to be slaughtered with a sharp knife [while] pronounc[ing] the name of God when you cut their throat."

MDOC religious programming policies allow each religious group with group meeting privileges to schedule two regular group gatherings per week. Three times a year, inmates are allowed to designate which religious services they would like to attend regularly, if any. According to policy, if granted permission, offenders are allowed to attend the religious services of another religious group as a guest.

Junaid claims that members of other religious groups were not allowed to attend Islamic services. According to Junaid, if an inmate from another religious group wanted to attend Islamic services, he would have to wait approximately six months and re-designate his religion accordingly. Junaid, who was an elected leader of the Islamic group at PCC, was allowed to attend the services of other religious groups without going through this process. His complaint, then, is that other offenders, who may be interested in studying the Islamic religion, were unable to come to Islamic services without going through a cumbersome process requiring them to re-designate themselves as Islamic. Junaid alleges that the "guest" policy outlined by MDOC was never allowed at PCC, although he admits that he was allowed to attend other services.

3. Refusal to Allow Religious Headgear

Under MDOC policy, offenders may only wear religious clothing items

during, but not to or from, "accommodated religious activities." This policy is an exception to the general rule that offenders are not permitted to wear headgear indoors. Muslim inmates, for example, are only allowed to wear a kufi, a type of prayer cap, during religious activities and outdoors. The general policy prohibiting offenders from wearing headgear indoors except for religious activities stems from security concerns because it would allow an inmate to conceal himself from security cameras. Junaid believes that his religion requires him to wear a kufi all the time, not just during religious activities.

4. Denial of Religious Fundraisers

At PCC, officially-sanctioned groups are permitted to hold fundraisers to raise money for charity or for future group activities. As a security measure to prevent "strong-arming" participation or donations, religious groups are not allowed to hold fundraisers. The monetary needs of religious groups are met through an Inmate Canteen Fund, and inmates may also contribute individually to any charitable cause they choose. According to Junaid, "fundraising to give charity" is a fundamental tenet of Islam.[4] Junaid also alleges that other faith-based

---

[4]In support of this argument, Junaid claims the Prophet Muhammad said, "Every Muslim has to give sadaqah (charity)" but if he cannot give money or donate his time, "[h]e should then do good deeds and shun evil, for this will be taken as sadaqah." Junaid also argues that "[t]here are other reports of the Prophet Muhammad that commands [Muslims] to give charity through fundraisers."

groups "such as the NAACP" are allowed to conduct fundraisers to the exclusion of the Muslim community.

5.  Discrimination in the Hiring of Chaplains

Junaid alleges that there has been a practice of discrimination at PCC in the selection and hiring of prison chaplains and Volunteers in Corrections (VIC's). Specifically, Junaid claims that there has never been a Muslim chaplain at PCC. Under MDOC policy, the chaplain is responsible for administering the entire, pluralistic spiritual program, providing spiritual guidance and counseling for all prisoners, and supervising the VIC's. According to defendants, and uncontradicted by Junaid, when a vacancy opens up for a chaplaincy, job opportunity announcements are mailed to external religious communities, including six contacts in the Muslim community. In addition, defendant Dickerson, PCC's former Supervisor of Religious/Spiritual programming, periodically met with Muslim leadership to recruit volunteers and chaplains. In his deposition, Junaid testified that he was told by an assistant superintendent that Muslims had applied for open chaplain positions and had not been hired.

6.  Refusal to Process Money Transaction With Only Legal Name Listed

Under MDOC policy all money transactions from an outside source or family member to an inmate must identify both the inmate's incarcerated name

(the prisoner's name at the time of incarceration) and the inmate's legal name, if he has changed his name while incarcerated. Junaid changed his name from Michael Cleaver to Rashid Ash-Sheikh Junaid while incarcerated. Under this policy, PCC would not process monetary transactions that listed only Junaid's new, legal name, and not his incarcerated name. Junaid testified in his deposition that PCC denied a money transaction from his mother because it did not list his incarcerated name and his legal name. Junaid claims that there is not enough room on the money transaction form for anyone to write both names.

7. Denial of Request for Additional Religious Classes

Junaid alleges that the Muslim community at PCC was denied the right to hold Arabic and Prayer classes. Under MDOC written policy, every religious group at PCC is given a primary and secondary meeting time every week; the primary time is for main worship, the secondary is for group study and meditation. The Arabic and Prayer classes Junaid requested were in addition to these two weekly meetings. According to Junaid, two meetings per week were inadequate to properly instruct Muslim inmates in the Arabic language and to learn prayers in both Arabic and English. Junaid further alleges that Christians are given the opportunity to worship eight times every week. The policy limiting religious groups to two religious meetings per week is based on limited space and a need to

accommodate many different religious groups.

8.  Retaliation for Filing Litigation

Around December 5, 2002, Junaid and another inmate served defendants Kempker, Schriro, Long, Dickerson, Luebbers, Smith, Dwyer, and Lombardi with the complaint in <u>Muhammed v. Kemper</u>, Cause Number 4:02CV1714 CDP. Shortly thereafter, Dwyer allegedly made a statement, either to Junaid or another inmate involved in the lawsuit, that he had received the lawsuit, and that he would harass or "get him back" for it.  On December 6, 2002, a group of Muslim inmates, including Junaid, were placed in administrative segregation under suspicion of involvement in a conspiracy to commit a felony.  Notes of the investigation show that an inmate informant told a prison staff member that there was a conspiracy among the inmates to kidnap and murder specific prison staff.  The inmates implicated by the informant were placed in administrative segregation during the pendency of the investigation.  After an investigation, which lasted 144 days, the inmates, including Junaid, were released from administrative segregation.  No charges were brought against Junaid and the other inmates.

## Discussion

Junaid does not specify whether his claims under 42 U.S.C. § 1983 are brought against defendants in their official or individual capacities.  The caption

of Junaid's complaint lists only the names of the defendants and is silent as to the capacities in which the defendants are named. The body of the complaint does not specify whether the defendants are being sued in their individual or official capacities, either. Instead, the complaint only states that defendants were acting "individually, collectively, and in concert with each other for joint purposes." The body of the complaint also alleges that "the actions of the defendants, both individually and collectively violates the plaintiffs 1st, 8th, 14th Amendment rights under the constitution and Missouri Bill of Rights." The defendants answered the complaint and raised as an affirmative defense that Junaid's claims for damages were barred to the extent that the defendants were being sued in the official capacities.

In Baker v. Chisom, 501 F.3d 920 (8th Cir. 2007), the Eighth Circuit Court of Appeals answered the question of "when a plaintiff [has] properly asserted § 1983 claims against a public official acting in his individual capacity." Id. at 923. In Baker, the appellate court held that plaintiff alleged only official capacity claims against certain defendants where the caption of the complaint was silent as to capacity, even though the body of the complaint included references to these defendants as "individual Defendants" and prayed for damages that may not be recovered in an official capacity suit. Id. The court concluded that the complaint

did not state individual capacity claims because "our cases require more than ambiguous pleading." Id. See Andrus ex rel. Andrus v. Arkansas, 197 F.3d 953, 955 (8th Cir. 1999) ("specific pleading of individual capacity is required"); Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999) ("[O]nly an express statement that [public officials] are being sued in their individual capacity will suffice"); Murphy v. State of Arkansas, 127 F.3d 750, 754 (8th Cir. 1997) ("a clear statement that officials are being sued in their personal capacities" is required). "A cryptic hint in plaintiff's complaint is not sufficient." Baker, 501 F.3d at 923 (8th Cir. 2007); see also Egerdahl v. Hibbing Community College, 72 F.3d 615, 620 (8th Cir. 1995) ("[P]laintiff's complaint [must] contain a clear statement of her wish to sue defendants in their personal capacities").

Under the caselaw, I must interpret Junaid's § 1983 claims as including only official-capacity claims. I must strictly enforce this pleading requirement because "the Eleventh Amendment presents a jurisdictional limit on federal courts in civil rights cases against states and their employees." Murphy, 127 F.3d at 755. Plaintiffs' claims for monetary damages against defendants in their official capacities are barred by the Eleventh Amendment and must be dismissed. "The Eleventh Amendment to the United States Constitution prohibits suits for damages against the state, agencies of the state or state officials acting in their official

capacities." Nix v. Norman, 879 F.2d 429, 432-33 (8th Cir. 1989). Because the complaint only asserts official capacity claims, Junaid is not entitled to recover monetary damages against defendants under §1983.

Although a state official may be sued in his official capacity for prospective injunctive relief, see Heartland Academy Community Church v. Waddle, 427 F.3d 525, 530 (8th Cir. 2005), Junaid's official-capacity claims fail because his requests for declaratory and injunctive relief are moot. Gladson v. Iowa Dept. of Corrections, 551 F.3d 825, 835 (8th Cir. 2009) (inmate's claims for injunctive and declaratory relief under RLUIPA and free exercise clause are moot when inmate is no longer subject to the offending policy); Pratt v. Corrections Corp. of America, 2008 WL 612571, *1 (8th Cir. March 7, 2008) (same). A prisoner's claims for injunctive relief to improve prison conditions are moot if he is no longer subject to those conditions. Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985). For the same reason, a released prisoner does not have standing to seek declaratory relief. Id. Because Junaid has been released from the custody of the MDOC and is no longer a prisoner at PCC, his claims for injunctive and declaratory relief are moot. Gladson, 551 F.3d at 835.

Junaid also lacks standing to bring his claim that members of other religious groups were prevented from attending the Muslim services. "A prisoner must

allege a personal loss." <u>Martin</u>, 780 F.2d at 1337.  Junaid, as a leader of the Muslim group, was permitted to attend other services.  Junaid does not have standing to bring claims alleging the violation of other prisoners' rights.  <u>Id.</u>  On this basis, defendants are entitled to summary judgment on all claims for declaratory and injunctive relief, as well as Junaid's claim based on attendance of Muslim services by other inmates.

Junaid's RLUIPA claim is also barred by sovereign immunity. The RLUIPA unambiguously conditions the receipt of federal prison funds on a State's consent to suit.  <u>Madison v. Virginia</u>, 474 F.3d 118, 131 (4th Cir. 2006).  Further, the Act specifically provides that, "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a).  "A state's waiver of sovereign immunity from suit, however, does not necessarily waive its immunity from monetary damages."  <u>Limbaugh v. Thompson</u>, 2006 WL 2642388 at *6 (M.D. Ala. Sept. 14, 2006).  Rather, "[a] waiver of a state's Eleventh Amendment immunity will be found only where stated by the most express language or by such overwhelming implications from the [statutory] text as [will] leave no room for any other reasonable construction."  <u>Id.</u> (internal quotations and citations omitted). "Therefore, absent an express waiver, the Eleventh Amendment bars a damages

action against a State in federal court." Id. (citation omitted).

Upon consideration, I conclude, as have other courts, that "RLUIPA's 'appropriate relief against a government' language falls short of the unequivocal textual expression necessary to waive State immunity from suits for damages." Madison, 474 F.3d at 131 (citation omitted). Further, the State of Missouri has not expressly waived its sovereign immunity to RLUIPA claims for monetary relief. Consequently, to the extent Plaintiff seeks monetary relief against defendants under the RLUIPA, his claim is barred by the Eleventh Amendment and must be dismissed. See Toler v. Leopold, 2007 WL 2907889, *1-2 (E.D. Mo. Oct. 1, 2007); Limbaugh, 2006 WL 2642388 at *6. See also Boles v. Neet, 402 F. Supp. 2d 1237, 1241 (D. Colo. 2005) ("appropriate relief" under RLUIPA limited to injunctive and/or declaratory relief against state governmental entity or official sued in official capacity); Agrawal v. Briley, 2006 WL 3523750 at *9 (N.D. Ill. Dec. 6, 2006) (monetary damages unavailable under RLUIPA against individual defendants sued in official capacities); Daker v. Ferrero, 2006 WL 346440 at *8 n. 5 (N.D. Ga. Feb. 13, 2006) (same); James v. Price, 2005 WL 483443 at *2 (N.D. Tex. Mar. 2, 2005) (same).

Because Junaid's complaint alleges only official-capacity claims and he is not entitled to monetary damages or declaratory or injunctive relief, his claims fail

as a matter of law and his complaint must be dismissed.  However, even if he had

properly stated claims for monetary damages against defendants in their personal

capacities,[5] Junaid's claims nevertheless fail as a matter of law for the reasons that

follow.

Respondeat Superior Liability Unavailable

Junaid's § 1983 claims against defendants Kempker and Schriro, the former

and current Directors of the MDOC,  must be dismissed because there is no

respondeat superior liability under § 1983.  Supervisory personnel are not liable

under § 1983 absent "a showing of direct responsibility for the improper action" or

"personal involvement of the officer being sued." Harris v. Pirch, 677 F.2d 681,

685 (8th Cir. 1982) (citations omitted). See Otey v. Marshall, 121 F.3d 1150, 1155

(8th Cir. 1997) ("Section 1983 liability cannot attach to a supervisor merely

because a subordinate violated someone's constitutional rights.") (citation

omitted); Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990) ("Liability

under § 1983 requires a causal link to, and direct responsibility for, the deprivation

of rights."); Glick v. Sargent, 696 F.2d 413, 414-15 (8th Cir. 1983) (finding

---

[5]Defendants assert qualified immunity as a defense.  However, under the first step in a qualified immunity analysis, if I find no constitutional violation, the analysis ends and the qualified immunity analysis ends.  Saucier v. Katz, 533 U.S. 194, 201 (2001). I need not reach the qualified immunity analysis here because "if no constitutional violation occurred, [then] plaintiff's claim fails as a matter of law because plaintiff did not prove an essential element of [his] § 1983 claim." Ambrose v. Young, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007).

respondeat superior theory inapplicable in § 1983 actions). A supervisor may be found liable for failure to supervise or control his subordinates only where a plaintiff establishes his "deliberate indifference or tacit authorization of the offensive acts by failing to take remedial steps following notice of a pattern of such acts by his subordinates." Wilson v. City of N. Little Rock, 801 F.2d 316, 322 (8th Cir. 1986). "In order for a supervisor to be held liable for the acts of a subordinate, something more must be shown than merely the existence of the supervisor-subordinate relationship." Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987). Absent such allegations, no individual liability can be imposed on defendants Kempker and Schriro as the former and current Directors of the Missouri Department of Corrections. Because Junaid cannot demonstrate the direct personal involvement of defendants Kempker and Schriro necessary to establish their § 1983 liability, they are entitled to summary judgment on Junaid's § 1983 claims brought against them.

First Amendment and RLUIPA claims

Junaid's complaint raises claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, et seq. and the First Amendment. RLUIPA establishes a statutory free exercise claim "encompassing a higher standard of review than that which applies to constitutional free exercise

claims." <u>Murphy v. Missouri Department of Corrections</u>, 372 F.3d 979, 986 (8th Cir. 2004). The statute provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.2000cc-1(a).[6] Prison inmates also retain protections afforded by the First Amendment "including its directive that no law shall prohibit the free exercise of religion." <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987). These rights are limited, however, by considerations unique to the demands of the penal system. <u>Fegans v. Norris</u>, 537 F.3d 897, 902 (8th Cir. 2008). In balancing the constitutional rights of the prisoner with the valid objectives of the penal system, courts typically defer to prison authorities "who are actually charged with and trained in the running of the particular institution under examination." <u>O'Lone</u>, 482 U.S. at 348.[7]

---

[6]RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.2000cc-5(7). For purposes of summary judgment, it is appropriate to assume that Junaid's beliefs are an "exercise of religion" under the statute.

[7]To ensure appropriate deference to prison officials, courts apply a reasonableness test less restrictive than that usually applied to alleged infringements of constitutional rights. <u>Fegans</u>, 537 F.3d at 902. The court considers the following four related factors, known as the <u>Turner</u>

Under the Free Exercise Clause and RLUIPA, Junaid must first raise a

material question of fact regarding whether defendants have placed a substantial

burden on his ability to exercise religion.  Gladson v. Iowa Dept. of Corrections,

551 F.3d 825, 833 (8th Cir. 2009); Patel v. U.S. Bureau of Prisons, 515 F.3d 807,

813 (8th Cir. 2008).  Once this initial showing has been made, "the review of that

burden under the Free Exercise Clause differs from . . . RLUIPA."  Id.  However, I

need not reach that issue because I conclude that Junaid has not put forth sufficient

evidence from which a reasonable jury could conclude that his ability to practice

his religion has been substantially burdened.  See id.; Gladson, 551 F.3d at 833

("If the prisoner fails to put forth sufficient evidence that his ability to practice his

religion has been substantially burdened, then the court need not apply the Turner

test to the Free Exercise Claim and the strict scrutiny test to the RLUIPA claim.").

To constitute a substantial burden the government policy or actions must:

> significantly inhibit or constrain conduct or expression that manifests
> some central tenet of a person's individual religious beliefs; must
> meaningfully curtail a person's ability to express adherence to his or
> her faith; or must deny a person reasonable opportunities to engage in

---

test, to determine whether prison regulations are reasonably related to legitimate penological
interests: (1) whether there is a valid, rational connection between the prison regulation and the
legitimate, neutral governmental interest used to justify it; (2) whether there exist alternative
means for prisoners to exercise the constitutional right at issue; (3) the impact that would be
caused by accommodation of the right on prison staff, other inmates, and allocation of prison
resources; and (4) whether any alternative exists that would fully accommodate the prisoner's
rights at de minimis cost to valid penological interests.  Turner v. Safley, 482 U.S. 78, 89 (1987).

those activities that are fundamental to a person's religion.

Murphy, 372 F.3d at 988.[8]  Where, as here, the significance of a religious belief is

not at issue, the same definition applies under RLUIPA and the Free Exercise

Clause.  Patel, 515F.3d at 813.

Junaid's claims regarding the food at Potosi do not constitute a substantial

burden on his religious exercise.  Junaid does not refute that pork substitutes are

offered when pork is served on the menu, he admits that he ate the non-pork

alternatives that were provided at meals and all the other remaining food, he

acknowledges that he can purchase pork alternatives at the canteen, and he does

not assert any injury associated with malnutrition.  Junaid's unsupported

conclusion that some of these alternatives or other products may contain pork

byproducts is merely unpersuasive speculation.  Moreover, the Eighth Circuit has

held that the failure to provide Halal meat does not substantially burden an

inmate's ability to practice his religion.  Pratt v. Corrections Corp. of America,

2008 WL 612571, *1 (8th Cir. March 7, 2008); see also Patel, 515 F.3d at 813.  In

light of the above, the Court finds that defendants are entitled to summary

_____

[8]In light of the Supreme Court's decision in Cutter v. Wilkinson, 544 U.S. 709 (2005),
the Eighth Circuit has recognized that "portions of the definition stated in Murphy requiring
religious beliefs to be a central tenet or fundamental may not apply to a RLUIPA claim."
Gladson, 551 F.3d at 833 (internal citations and quotation marks omitted).  However, I need not
reach that issue here because, for purposes of summary judgment, I assume the sincerity of
Junaid's religious beliefs and the significance of his religious exercises to his faith.  See id.

judgment on this claim.  See <u>Robinson v. Kempker</u>, 2007 WL 1385700 (E.D. Mo. May 8, 2007) (granting summary judgment in favor of defendants on Islamic inmate's claim that PCC's food policy with respect to pork violated RLUIPA).

Junaid also offers no evidence that being allowed to wear a kufi only during religious activities, as opposed to wearing it all the time, for security reasons substantially burdens his religious exercise.  See <u>Rogers v. Scurr</u>, 676 F.2d 1211, 1216 (8th Cir. 1982) ("We find that no constitutional right of the prisoners was violated by the prohibition on wearing prayer caps and robes outside religious services.").

Junaid's claim about PCC's "guest policy" fails as a matter of law because Junaid admits that he was permitted to attend other religious services.  Because Junaid cannot assert claims on behalf of other inmates, <u>see</u> <u>Martin</u>, 780 F.2d at 1337, summary judgment must be granted in favor of defendants.

Junaid also fails to offer any evidence that would lead a fact-finder to conclude that PCC's prohibition on fundraising activities by religious organizations substantially burdens his religious exercise.  The undisputed evidence demonstrates that all  religious organizations were prohibited from holding fundraisers at PCC as a security measure but that all inmates, including Junaid, were allowed to contribute individually to charitable causes.  Junaid was

advised of this fact by defendant Dickerson, the former Supervisor of Religious/Spiritual Programming at PCC. Moreover, the religious groups, including the Muslim community, at PCC were funded by inmate canteen funds.

In an attempt to defeat summary judgment, Junaid argues that the NAACP is a "faith based group" and was allowed to hold fundraisers at PCC. However, Junaid has no evidence that the NAACP -- which states its mission is to "[e]nsure the political, educational, social, and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination"[9] -- is a religious organization,[10] and he cannot avoid summary judgment by "merely point[ing] to unsupported self-serving allegations," but "must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor." Smith v. International Paper Co., 523 F.3d 845, 848 (8th Cir. 2008); see also Bacon v. Hennepin County Medical Center, 550 F.3d 711, 716 (8th Cir. 2008) (self-serving affidavits do not defeat a properly supported motion for summary judgment); Gander Mountain Co. v. Cabela's, Inc., 540 F.3d 827, 831 (8th Cir. 2008).[11] Because Junaid had other

---

[9]Defs.' Reply Brief at p.7.

[10]The NAACP did not hold any religious services at PCC.

[11]Junaid's equal protection claim also fails because Junaid has offered no evidence that he was treated differently than a similarly situated class of inmates, that the different treatment burdened one of his fundamental rights, and that the different treatment had no rational relation to any legitimate penal interest. Murphy, 372 F.3d at 984. Here, Junaid's unsupported, self-

avenues available to him through which he could contribute to charities, Junaid has failed as a matter of law to demonstrate that PCC's fundraising policy substantially burdened him in the exercise of his religion.  See Blankenship v. Gunter, 898 F.2d 625, 627-28 (8th Cir. 1990).

The same is true of Junaid's claim that Christians at PCC were given opportunities to worship eight times per week whereas his Islamic group was only allowed to hold religious services twice per week.  Defendants have presented competent evidence of MDOC's policy that all religious groups with meeting privileges at PCC were limited to two religious services per week to accommodate all group meetings in a limited amount of space.  In light of this evidence, Junaid cannot defeat summary judgment merely by pointing to his own conclusory and unsupported assertions in his affidavit.  Moreover, Junaid has offered no evidence that would permit a fact-finder to conclude that having only two services per week policy substantially burdened his religious exercise.  See Weir v. Nix, 114 F.3d 817, 821 (8th Cir. 1997) (policy limiting inmate to three hours of group worship per week did not substantially burden his religious exercise).

Junaid has also failed to demonstrate that PCC's policy, which requires the

---

serving assertion that the NAACP is a "faith based group" is insufficient as a matter of law to demonstrate that he, as a member of the Muslim community, was treated differently than a similarly situated class of Christian inmates.

use of an inmate's legal or religious name, along with his commitment name, on

money transfers constitutes a substantial burden on his religious exercise.  In

Salaam v. Lockhart, 905 F.2d 1168, 1174 (8th Cir. 1990), the Eighth Circuit

approved the use of an a/k/a alternative as a means of allowing a prisoner to use his

religious name while maintaining an accurate prison record consistent with the free

exercise clause, and the court's reasoning has been applied to RLUIPA claims as

well.  See Newingham v. Magness, 2008 WL 748372, *5 (E.D. Ark. March 18,

2008).  Here, Junaid has offered no evidence that PCC's policy of requiring both

legal and commitment names to be listed before money transfers could be

processed imposed a substantial burden upon the exercise of his religion.

Finally, Junaid does not oppose summary judgment on his claim that the

"Muslim community" was discriminated against in the selection and hiring of

prison chaplains and volunteers, and defendants are entitled to judgment as a matter

of law on this claim for the reasons stated in their motion.  As defendants correctly

note, Junaid lacks standing to assert this claim on behalf of the Muslim community.

See Meis v. Gunter, 906 F.2d 364, 367-68 (8th Cir. 1990).  Moreover, Junaid has

not offered anything beyond his own unsubstantiated assertions and inadmissible

hearsay[12] in support of this allegation.  The uncontraverted evidence offered by defendants demonstrates that when a vacancy opens up for a chaplaincy at PCC, job opportunity announcements are mailed to external religious communities, including six contacts in the Muslim community, and that Dickerson periodically met with Muslim leadership to recruit volunteers and chaplains.  Under these facts, I find that defendants are entitled to summary judgment on this claim.

Because Junaid has not put forth sufficient evidence that a reasonable jury could conclude that his ability to practice his religion has been substantially burdened, defendants are entitled to judgment as a matter of law on Junaid's first amendment and RLUIPA claims.

Retaliation Claim

Junaid alleges that defendants manufactured charges against him for conspiring to murder PCC staff in retaliation for his legal activities in Muhammed v. Kemper, Cause Number 4:02CV1714 CDP.  Prison officials may not retaliate against an inmate for engaging in constitutionally-protected activity, such as filing a grievance or instituting litigation.  Goff v. Burton, 7 F.3d 734, 736 (8th Cir.

---

[12]In his deposition, Junaid testified that he was told by an assistant superintendent that Muslims had applied for open chaplain positions and had not been hired.  This testimony is inadmissible hearsay and may not be used to avoid summary judgment.  See Anda v. Wickes Furniture Co., Inc., 517 F.3d 526, 534 (8th Cir. 2008).

1993); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989).  A prison official's action violates § 1983 when performed in retaliation for "the exercise of a constitutionally protected right . . . even if the act, when taken for a different reason, would have been proper."  Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990) (citations omitted).  Junaid must first show that he engaged in constitutionally protected conduct and then show that but for that conduct defendants retaliated against him.  Naucke v. City of Park Hills, 284 F.3d 923, 928 (8th Cir. 2002).

Summary judgment in favor of defendants Roper and King is proper because they were not made parties to the Muhammed v. Kemper case until after the investigation of Junaid was initiated and he was placed in administrative segregation.  Moreover, Junaid cannot demonstrate the requisite causal connection for the remaining defendants because the undisputed evidence demonstrates that the investigation was initiated only after an inmate informant told prison officials that several inmates, including Junaid, were plotting to murder or take hostage three prison officials.  Even accepting as true Junaid's statement that Dwyer said he was going to "get him," Junaid has presented no evidence that Dwyer played any role in the initiation of the investigation into Junaid and his alleged co-conspirators.  Under these circumstances, Junaid cannot show that, but for the

filing of the Muhammad v. Kemper case, the charges would not have been made against him.

Moreover, to the extent Junaid is attempting to challenge his assignment in administrative segregation as retaliatory or in violation of his due process rights, that claim must fail as well.  "Prisoners do not shed all constitutional rights at the prison gate, but lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  Sandin v. Conner, 515 U.S. 472, 485 (1995) (citations omitted).  The focus should be on whether the alleged deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id. at 484.  Because administrative segregation is not an atypical or significant hardship on an inmate, Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002), and Junaid was placed there after an informant told prison officials that Junaid was involved in a murder plot, Junaid cannot demonstrate causation for a retaliation claim or any violation of his due process rights as a matter of law.  See Robinson v. Kemper, 2007 WL 1385700, *4 (E.D. Mo. May 8, 2007) (no retaliation claim where inmate claimed that he was placed in administrative segregation at PCC during the murder plot investigation for his involvement in the Muhammad v. Kemper case).

Equal Protection Claim

Junaid also appears to be alleging a violation of the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause, a protection afforded prison inmates, requires that the government "treat similarly situated people alike." Murphy, 372 F.3d at 984 (citing Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999)(internal citations omitted)). There is no requirement that the government treat dissimilarly situated people alike. Klinger v. Dept. of Corrections, 31 F.3d 727, 731 (8th Cir. 1994). To succeed on an equal protection claim, Junaid must show that he has (1) been treated differently; than (2) a similarly situated class of inmates; (3) that the different treatment burdens one of his fundamental rights; and (4) that the different treatment is not rationally related to any legitimate penological interest. Murphy, 372 F.3d at 984 (citing Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998)). Although Junaid's complaint does not specify how his fourteenth amendment rights were violated, I construe his complaint liberally and assume that he alleges equal protection violations with respect to his claims that: Muslims were not allowed to attend other religious services under the guest policy; Muslims were not allowed to hold fundraisers but other "faith-based groups" were allowed to do so; and, that Muslims were only allowed to hold two religious services per week but Christians were allowed eight weekly religious services. As discussed above in

connection with his RLUIPA and free exercise claims, Junaid's equal protection

claims fail because Junaid has offered no competent evidence that he was actually

treated differently than similarly situated inmates.  Summary judgment is granted to

defendants on this claim.

Eighth Amendment Claim

Junaid's complaint does not specify how his eighth amendment rights were

violated, but in opposition to summary judgment he contends that his assignment to

administrative segregation was in violation of the Eighth Amendment.  As

discussed above, to the extent Junaid claims this assignment was retaliatory, the

claim fails as a matter of law.  If Junaid contends that his assignment in

administrative segregation for 144 days during the pendency of the investigation

amounts to cruel and unusual punishment, this claim fails as well.

"The treatment a prisoner receives and the conditions under which he is

confined are subject to scrutiny under the Eighth Amendment."  Brown v. Nix, 33

F.3d 951, 954 (8th Cir. 1994).  "The Constitution does not mandate comfortable

prisons, but neither does it permit inhumane ones."  Id. at 955.  Accordingly, "a

prison official violates the Eighth Amendment when two conditions are met: 1) the

deprivation alleged is sufficiently serious - the prison official's act or omission

results in the denial of the minimal civilized measure of life's necessities; and 2)

the prison official acts with deliberate indifference - he knows of and disregards an excessive risk to inmate health and safety." Id. (internal citations and quotation marks omitted). Under this standard, confinement to administrative segregation for a period of 144 days while PCC officials investigated Junaid's alleged involvement in a murder conspiracy did not amount to cruel and unusual punishment in violation of the Eighth Amendment as a matter of law. See id. (no eighth amendment violation where inmate confined to administrative segregation for nine years for disciplinary infractions); see also Manuel v. Kirk, 2004 WL 2711890, *1 (8th Cir. Nov. 30, 2004). And as Junaid has not alleged deprivation of any of life's basic necessities during his confinement in administrative segregation, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Wilson v. Seiter, 501 U.S. 294, 305 (1991). Accordingly, defendants are entitled to summary judgment on Junaid's eighth amendment claim.

Remaining Claims

For the foregoing reasons, defendants are entitled to judgment as a matter of law on Junaid's complaint. In his complaint, Junaid alleges violations of state law, however he cannot bring an action redressing deprivation of state rights under § 1983. Bagley v. Rogers, 5 F.3d 325, 328 (8th Cir. 1993). To the extent Junaid's

complaint does assert state law causes of action against defendants, this Court declines to exercise supplemental jurisdiction over them.  See 28 U.S.C. § 1367(c)(3).  A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [#54] is granted, and plaintiff's federal claims are  dismissed with prejudice.

**IT IS FURTHER ORDERED** that to the extent that plaintiff's complaint asserts state-law claims, those claims are dismissed without prejudice.

**IT IS FURTHER ORDERED** that the motion for extension of time [#61] is denied as moot.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of March, 2009.